Slip Op. 15-2

UNITED STATES COURT OF INTERNATIONAL TRADE

FORD MOTOR COMPANY,                      :

                     *Plaintiff*,           :

                v.                      :

                                            Court No. 09-00375

UNITED STATES OF AMERICA and             :
U.S. DEPARTMENT OF HOMELAND
SECURITY, U.S. CUSTOMS AND BORDER        :
PROTECTION,
                                      :

                    *Defendants*.

[Granting Plaintiff's Motion for Judgment on the Agency Record]

Dated:  January 13, 2015

       Matthew W. Caligur, Baker & Hostetler LLP, of Houston, Texas, argued for Plaintiff.  With him on the briefs was C. Thomas Kruse.  Of counsel on the briefs was Paulsen K. Vandevert, The Ford Motor Company, of Dearborn, Michigan.

       Justin R. Miller, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, New York, argued for Defendants.  With him on the briefs were Stuart F. Delery, Assistant Attorney General, Civil Division, and Barbara S. Williams, Attorney-in-Charge, and Amy M. Rubin, Assistant Director, Commercial Litigation Branch.  Of counsel on the briefs was Yelena Slepak, Office of the Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, U.S. Department of Homeland Security, of New York, New York.

# OPINION

RIDGWAY, Judge:

       In this action, Plaintiff Ford Motor Company challenges, *inter alia*, the determination of the

U.S. Customs Service[1] that 17 drawback claims filed by Ford prior to December 3, 2004 (the

---

      [1]The U.S. Customs Service – formerly part of the U.S. Department of the Treasury – is now part of the U.S. Department of Homeland Security, and is commonly known as U.S. Customs and Border Protection.  *See* Bull v. United States, 479 F.3d 1365, 1368 n.1 (Fed. Cir. 2007).  The agency is referred to as "Customs" herein.

"Drawback Claims") were not deemed liquidated pursuant to 19 U.S.C. § 1504(a)(2), the statutory

amendment enacted by Congress in December 2004 to expressly provide for the deemed liquidation

of aging drawback claims.  *See* Ford's Motion for Judgment at 1-2, 5-6, 7, 10 ("Pl.'s Brief"); 19

U.S.C. § 1504(a)(2) (2006); *see also* Defendants' Response to Plaintiff's Motion for Judgment on

the Agency Record at 22 ("Defs.' Response Brief") (noting that "the contested determination is

[Customs'] determination that Ford's drawback entries [*i.e.,* claims] did not become deemed

liquidated as of December 3, 2005").[2]

Specifically, in its pending Motion for Judgment, Ford argues that the 17 Drawback Claims

were deemed liquidated (*i.e.*, liquidated by operation of law) as of December 3, 2005, pursuant to

subparagraph (C) of § 1504(a)(2).  *See, e.g.*, Pl.'s Brief at 1-2, 25; Ford's Reply in Support of

Motion for Judgment at 1 ("Pl.'s Reply Brief"); *see generally* <u>Ford Motor Co. v. United States</u>, 35

CIT ____, ____, 806 F. Supp. 2d 1328, 1332-33 (2011) ("<u>Ford Motor I</u>") (briefly summarizing

Ford's claims, in ruling on motion to dismiss).  According to subparagraph (C):

> An entry or claim for drawback filed before December 3, 2004, the liquidation of
> which is not final as of December 3, 2004, shall be deemed liquidated on the date
> that is 1 year after December 3, 2004 [*i.e.*, on December 3, 2005], at the drawback
> amount asserted by the claimant at the time of the [drawback] entry or claim.

19 U.S.C. § 1504(a)(2)(C).

It is undisputed that Ford filed all 17 of the Drawback Claims before December 3, 2004; and

_____

[2]All citations to federal statutes are to the 2006 edition of the United States Code.  The
pertinent text of the cited provisions has remained substantially the same at all times herein, with
the exception of 19 U.S.C. § 1504(a), which was amended on December 3, 2004.

Similarly, all citations to regulations are to the 2006 edition of the Code of Federal
Regulations.  The pertinent text of the cited provisions has remained substantially the same at all
times herein, although some provisions were renumbered in 1998.

it is similarly undisputed that all 17 of the Drawback Claims remained unliquidated as of December

3, 2005.  *See*, *e.g.*, Pl.'s Brief at 2, 3, 25; Defs.' Response Brief at 1-2, 3.  As discussed in greater

detail below, however, Customs has taken the position that, notwithstanding the language of

subparagraph (C), drawback claims such as the 17 at issue here – *i.e.*, drawback claims that were

filed before December 3, 2004, and which remained unliquidated one year later – were not deemed

liquidated pursuant to that subparagraph if any of the import entries underlying the drawback claims

were not yet liquidated and those liquidations final as of December 3, 2005.  *See*, *e.g.*, *id*. at 2, 3.

And Customs maintains that, as to each of the 17 Drawback Claims at issue, there is at least one

underlying import entry that was unliquidated and not final on that date.  *See*, *e.g.*, *id*. at 2, 7.[3]

According to Customs, Ford's Drawback Claims therefore fall within a different

subparagraph of the statute – specifically, subparagraph (B) of 19 U.S.C. § 1504(a)(2).  *See*, *e.g.*,

Defs.' Response Brief at 3, 7.  However, a drawback claim that is covered by subparagraph (B) is

deemed liquidated only if the drawback claimant first "deposit[s] . . . estimated duties on the

unliquidated imported merchandise" and "fil[es] with the Customs Service . . . a written request for

. . . liquidation" of the drawback claim, which "must include a waiver of any right to payment or

refund under other provisions of law."  19 U.S.C. § 1504(a)(2)(B); *see also*, *e.g.*, Defs.' Response

---

[3]Ford takes strong exception to Customs' assertion that the 17 Drawback Claims had underlying import entries that were not yet liquidated and final as of December 3, 2005.  *See*, *e.g.*, Pl.'s Brief at 2 (arguing that "all of the consumption [*i.e.*, import] entries underlying Ford's Drawback Claims were liquidated" prior to December 3, 2005); *id*. at 6-7 (same); Pl.'s Reply Brief at 3 (stating that "no unliquidated consumption [*i.e.*, import] entries prevented the deemed liquidation of Ford's Drawback Claims on or before December 3, 2005").  This factual dispute has no effect on the disposition here, however.  In other words, the analysis and the outcome are the same whether or not the 17 Drawback Claims had underlying import entries that were unliquidated and not final as of December 3, 2005.  Accordingly, the analysis below does not always state that Ford disputes Customs' assertions on this point.

Brief at 7.  Because there is no dispute that Ford has not taken all of these actions, Customs

concluded that the 17 Drawback Claims have never been deemed liquidated. *See id*. at 3-4, 7, 12-13,

15.[4]

In its opening brief, Ford states that it seeks both declaratory and injunctive relief – that is,

"a declaratory judgment that Customs' interpretation of 19 U.S.C. § 1504(a)(2)(C) as meaning that

a drawback claim remains open and not subject to deemed liquidation as long as any underlying

consumption [*i.e.*, import] entry remains unliquidated is . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," as well as "[a] declaratory judgment that

Customs has no legal authority to review, liquidate, or take any action with respect to the Drawback

Claims, other than to recognize their proper status as finally liquidated at the amounts claimed by

Ford," in addition to "permanent injunctive relief consistent with such declaratory relief." Pl.'s

Brief at 2, 9-10; *see also* Ford's Supplemental Brief in Support of Motion for Judgment at 11 ("Pl.'s

---

[4]A number of the 17 Drawback Claims at issue in this action are among the drawback claims at issue in Ford Motor Company v. United States of America, Court No. 10-00142, which – like this action – challenges Customs' construction of 19 U.S.C. § 1504(a)(2). *See* Defs.' Response Brief at 6 & Exh. 1; Joint Status Report at 6 & n.7 (filed Feb. 29, 2012) (stating, *inter alia*, that five of the Drawback Claims here at issue are included in the 15 drawback claims at issue in Court No. 10-00142). That action currently is on the Court's Reserve Calendar.

A second action, also captioned Ford Motor Company v. United States of America, Court No. 10-00014, similarly challenges Customs' construction of the same statute. However, there is no overlap between the drawback claims at issue in that action and the Drawback Claims at issue here. Defs.' Response Brief at 6 & Exh. 1; Joint Status Report at 5-6. That action too remains on the Court's Reserve Calendar.

Likewise, a third action, Ford Motor Company v. United States, Court No. 10-00138, also appears to challenge Customs' construction of § 1504(a)(2). *See* Summons (April 21, 2010), filed in Court No. 10-00138; Joint Status Report at 6. But, again, there is no overlap between the drawback claims at issue in that action and those at issue here. *Id*.

Supp. Brief") (stating that Ford seeks a determination that "Ford's Drawback Claims have been deemed liquidated by operation of law, . . . because the Drawback Claims liquidated as aging claims subject to 19 U.S.C. § 1504(a)(2)").[5]

Jurisdiction lies under 28 U.S.C. § 1581(i).  *See* Ford Motor I, 35 CIT ____, 806 F. Supp. 2d 1328 (denying motion to dismiss for lack of subject matter jurisdiction, holding that action presents case or controversy that is both ripe and within Court's (i) jurisdiction).  For the reasons detailed below, Customs' interpretation of 19 U.S.C. § 1504(a)(2) cannot stand.  Plaintiff's Motion for Judgment therefore must be granted.

---

[5]Ford failed to file a proposed order or judgment with its briefs.  *See* USCIT R. 7(b)(1)(E) (requiring all motions to "be accompanied by a proposed order").  Further, although Ford's opening brief purports to include the requisite "short conclusion stating the relief sought," that text states only that "Ford Motor Company respectfully requests that the Court grant Ford's Motion for Judgment, and provide Ford with such other and further relief as [the] Court deems to be just[,] proper and equitable."  *See*  USCIT R. 81(j)(9); Pl.'s Brief at 28; *see also* USCIT R. 7(b)(1)(D) (requiring that all motions "state the relief sought").  And peppered throughout Ford's papers are numerous statements concerning requested relief that are, in various respects, overlapping and/or conflicting, making it (as a practical matter) impossible to be certain as to the precise remedies that the company seeks.

As to declaratory relief, *see*, *e.g.*, Second Amended Complaint for Injunctive and Declaratory Relief ("Complaint"), at 3-4 (Preliminary Statement); *id*. ¶¶ 53-56, 58-59, 61-62; *id*., at 24-25 (Prayer for Relief  ¶¶ C-H); Pl.'s Brief at 2, 9-10, 16; Pl.'s Supp. Brief at 5, 11.  As to injunctive relief, *see*, *e.g.*, Complaint, at 2-4 (Preliminary Statement); *Id*. ¶¶ 40, 42-43, 64-66; *id*., at 24 (Prayer for Relief  ¶¶ A-B); Pl.'s Brief at 2; Pl.'s Supp. Brief at 5.

Curiously, some of Ford's requests are framed as prayers for *interim* relief.  *See*, *e.g.*, Complaint ¶ 65 (purporting to seek permanent injunction "pending the outcome of Ford's requests for declaratory relief"); *id*. ¶ 66 (purporting to seek permanent injunction "pending the outcome of Ford's requests for declaratory relief" and "pending the outcome of this proceeding"); *id*., at 24 (Prayer for Relief ¶ A) (purporting to seek permanent injunction "pending the outcome of this action").

# I. **Background**

For purposes of this case, "drawback" refers to Customs' refund of duties that were paid upon the importation of an article or materials which were later exported.  19 U.S.C. § 1313; 19 C.F.R. § 191.2(i)-(k) (2006).[6] As the Court of Appeals has explained, the purpose of such drawback is not to "compensate for duty overpayments, but instead [to] help enforce the United States' policy of 'encourag[ing] domestic manufacture of articles for export and . . . allow[ing] those articles to compete fairly in the world marketplace.'"  Shell Oil Co. v. United States, 688 F.3d 1376, 1382 (Fed. Cir. 2012) (citing Hartog Foods Int'l, Inc. v. United States, 291 F.3d 789, 793 (Fed. Cir. 2002)).  The Government notes that, generally, under circumstances such as those here, "if imported merchandise is either exported or manufactured into an article that is exported, the exporter (or [the] person to whom [has been] transferred the right) [*i.e.*, the drawback claimant] is entitled to a refund of up to 99 percent of the duties that were paid on the merchandise upon its importation."  Defs.' Response Brief at 10.[7]

Given the nature of a drawback claim, there are two relevant sets of entries: (1) the underlying "import entry" or entries (also known as the "consumption entry" or entries) filed with Customs at the time of importation; and (2) the drawback entry (or "drawback claim"), filed some

---

[6]The legal background set forth above draws heavily on the summary in Ford Motor I, 35 CIT at ____, 806 F. Supp. 2d at 1330.

[7]As Ford puts it, "[t]he general purpose of drawback is to encourage American exports and to promote competition in foreign markets by refunding duties paid on imported goods that are used in the processing and manufacture of goods here in the United States that are subsequently exported to foreign markets."  Complaint, at 1-2 (Preliminary Statement).

time after importation, which covers one or more underlying import entries.[8]  Customs finalizes the

payment of drawback through the process of the "liquidation" of a drawback claim.  19 C.F.R. §§

159.1, 191.81.[9]   Customs' practice, memorialized in its regulations, is generally to defer the

liquidation of drawback claims until either all import entries underlying the drawback claim have

been liquidated and those liquidations are "final" (*i.e.*, the period for filing of any protest or claim

against the liquidation of the import entries has expired), or the drawback claimant has filed a waiver

with a deposit of any additional duties owed on the imported merchandise.   19 C.F.R. §

191.81(a)(1)&(2) (providing that "[d]rawback entries may be liquidated after: (1) [l]iquidation of

the [underlying] import entry becomes final; or (2) [d]eposit of estimated duties on the imported

merchandise . . . before liquidation of the import entry"); *see generally* Defs.' Response Brief at 10;

Defendants' Supplemental Briefing Pursuant to the Court's June 17, 2013 Order at 2 n.2, 3 ("Defs.'

Supp. Brief").

_____

[8]Technically, a "drawback entry" is the form that a drawback claimant files to request payment of drawback, and is but one part of a "drawback claim."  19 C.F.R. § 191.2(j)-(k); Ford Motor I, 35 CIT at ____ n.1, 806 F. Supp. 2d at 1330 n.1.  As the Government points out, however, the terms "drawback claim" and "drawback entry" often are used interchangeably.  *See* Defs.' Response Brief at 1 n.1.  To facilitate comprehension, the term "drawback claim" is used generally throughout this opinion, to help readers more readily differentiate drawback claims from the import (or consumption) entries that underlie the drawback claims.

[9]Customs also liquidates the import entry (or entries) that underlie a drawback claim.  19 C.F.R. § 191.81.

As set forth in Customs' regulations, "[l]iquidation means the final computation or ascertainment of the duties . . . or drawback accruing on an import entry," after which the final amount due (if any) is calculated and billed, completing the import transaction.  19 C.F.R. § 159.1; Chemsol, LLC v. United States, 755 F.3d 1345, 1349 (Fed. Cir. 2014); Ford Motor Co. v. United States, 688 F.3d 1319, 1321 (Fed. Cir. 2012) (describing liquidation as "[t]he process for bringing . . . customs transactions to final resolution").

In agency parlance, Customs considers a drawback claim to be "workable" (*i.e.*, ready for liquidation) when all of the import entries that underlie that drawback claim have been liquidated and those liquidations have become final.  *See* Defs.' Response Brief at 10-11.  The Government argues that Customs' practice of deferring liquidation of drawback claims until after the underlying import entries have been liquidated and become final (or until the drawback claimant has filed a waiver and deposited any additional duties) is necessitated by Customs' concern about the potential for improper double refunds of import duties, as well as by considerations of Customs' administrative convenience (or "feasibility") – *i.e.*, the administrative burden that would be imposed on the agency in coordinating the liquidation of import entries at 300-plus ports of entry with the liquidation of drawback claims at the four offices that Customs has designated to process drawback claims.  *See* Defs.' Supp. Brief at 3-5 (summarizing Customs' rationale for deferring liquidation of drawback claims until after underlying import entries are liquidated and final).[10]  However, there is

_____

[10]Customs is concerned about the potential for the agency to inadvertently refund duties twice on a single import entry – for example, the agency may pay a drawback claim that is based on a particular import entry but then later also refund duties to the importer on that same import entry via other means (such as through a protest of Customs' liquidation of that import entry).  *See*, *e.g.*, Defs.' Response Brief at 10, 19, 20-21; Defs.' Supp. Brief at 3, 4-5; Transcript of Oral Argument at 42 ("Tr.") (counsel for the Government).  To illustrate Customs' concerns, the Government hypothesizes that "[Customs'] drawback office in Chicago processes a drawback claim based on estimated duties deposited at the time of entry and refunds 99 % of the estimated duties paid, and then the Port of Miami and the Port of Long Beach process[] the import entries underlying the drawback claim and determine[] that the deposited estimated duties are in excess of actual duties owed.  When the ports liquidate the entries and refund the excess import duties to the importer of record, a double refund of duty . . . [would] occur[] – first, when the drawback office refunded estimated duties paid as a part of the drawback claim and again, when the underlying import entries were liquidated by the ports."  Defs.' Supp. Brief at 4-5; *see also* Tr. at 42 (counsel for the Government).  It is also possible that two different entities may have potential claims to the same import duties – for example, an importer (or its surety) and a drawback claimant (which may be an entity other than the importer/surety).  *See* Defs.' Response Brief at 19, 20-21; Tr. at 42 (counsel for the Government).

no statute that requires Customs to defer liquidation of drawback claims until after the underlying import entries have been liquidated and become final.[11]

In certain circumstances, Customs pays a drawback claimant the estimated amount of drawback before the agency liquidates the claimant's drawback claim, under a practice known as "accelerated payment."  19 C.F.R. § 191.92(a)(1) (explaining that "[a]ccelerated payment of drawback consists of the payment of estimated drawback before liquidation of the drawback entry [*i.e.*, drawback claim]").  The claimant thus benefits from being paid in advance of the processing of its claim.  Later, when Customs liquidates the drawback claim, Customs reconciles the (estimated) accelerated payment and the actual liquidation amount.  For drawback claims where the accelerated payment equals the amount determined at liquidation, the drawback claim liquidates as "no change," and no bill is issued.  On the other hand, where Customs has over-paid a drawback claim at the time of accelerated payment, Customs issues a bill to collect the balance owed to the United States.  *See* Defs.' Response Brief at 4-5.[12]

---

[11]Ordinarily, Customs must liquidate an import entry within one year of the date the subject merchandise entered the United States, or the import entry is deemed liquidated.  19 U.S.C. § 1504(a)(1).  However, Customs may extend the liquidation period by a maximum of three years, for a possible total of four years.  19 U.S.C. § 1504(b).  If Customs does not affirmatively liquidate the import entry in a timely fashion (including any extensions), the import entry is deemed liquidated.  *Id*.  The sole exception is when liquidation of the import entry is suspended, either by statute or by court order, due to antidumping and/or countervailing duty proceedings.  19 U.S.C. § 1504(a)(1).  As a practical matter, import entries may remain unliquidated for a matter of years due to antidumping and/or countervailing duty proceedings.  *See*, *e.g.*, Defs.' Supp. Brief at 6-7 (summarizing process of suspension of liquidation by statute or court order in antidumping and/or countervailing duty proceedings); *see also* n.23, *infra* (addressing, *inter alia*, relationship between antidumping and/or countervailing duty proceedings and the liquidation of import entries and drawback claims).

[12]If Customs determines that it has overpaid on a drawback claim that has already been liquidated (whether affirmatively liquidated by the actions of the agency, or liquidated by operation

Subject to certain limited exceptions not relevant here, drawback claims that are not affirmatively liquidated by Customs are "deemed liquidated" by operation of law, at the amount originally asserted by the claimant, pursuant to the provisions of the statute at issue in this action – that is, 19 U.S.C. § 1504(a)(2). Prior to December 3, 2004, the liquidation statute provided for the deemed liquidation of import (*i.e.*, consumption) entries, but did not expressly address the deemed liquidation of drawback claims. Concerned that growing numbers of aging drawback claims were collecting dust at Customs, and were "creat[ing] an unwarranted liability and the possibility that the [drawback] claimant [would] have to reimburse the U.S. Treasury any drawback monies paid to the claimant – even several years [after] the claim was paid to the drawback claimant," Congress enacted 19 U.S.C. § 1504(a)(2) as part of the Miscellaneous Trade and Technical Corrections Act of 2004, in order to "remove such liability overhanging drawback claimants." *See* Ford Motor I, 35 CIT at ____, 806 F. Supp. 2d at 1334 (quoting S. Rep. No. 108-28, at 172-73 (2003)); Miscellaneous Trade and Technical Corrections Act of 2004, Pub. L. No. 108-249, § 1563, 118 Stat. 2434 (eff. Dec. 3, 2004).

In particular, Congress intended 19 U.S.C. § 1504(a)(2) to "requir[e] U.S. Customs (1) to liquidate existing drawback claims, and (2) to liquidate future drawback claims within a specified period of time, as U.S. Customs already [did] for merchandise entered for consumption." S. Rep. No. 108-28, at 173. In its entirety, 19 U.S.C. § 1504(a)(2) reads:

---

of law), Customs normally cannot recover the difference from the claimant. *See* 19 U.S.C. §§ 1514(a), 1520(a)(4).

(2)  Entries or claims for drawback

    (A)  In general

        Except as provided in subparagraph (B) or (C), unless an entry or claim for drawback is extended under subsection (b) of this section [entitled "Extension"[13]] or suspended as required by statute or court order, an entry or claim for drawback not liquidated within 1 year from the date of entry or claim shall be deemed liquidated at the drawback amount asserted by the claimant or claim.  Notwithstanding section 1500(e) of this title [which requires Customs to give notice of liquidation], notice of liquidation need not be given of an entry deemed liquidated.

    (B)  Unliquidated imports

        An entry or claim for drawback whose designated or identified [*i.e.*, underlying] import entries have not been liquidated and become final within the 1-year period described in subparagraph (A), or within the 1-year period described in subparagraph (C), shall be deemed liquidated upon the deposit of estimated duties on the unliquidated imported merchandise, and upon the filing with the Customs Service of a written request for the liquidation of the drawback entry or claim.  Such a request must include a waiver of any right to payment or refund under other provisions of law.  The Secretary of the Treasury shall prescribe any necessary regulations for the purpose of administering this subparagraph.

    (C)  Exception

        An entry or claim for drawback filed before December 3, 2004, the liquidation of which is not final as of December 3, 2004, shall be deemed liquidated on the date that is 1 year after December 3, 2004 [*i.e.*, on December 3, 2005], at the drawback amount asserted by the claimant at the time of the entry or claim.

19 U.S.C. § 1504(a)(2).

---

[13]Subsection (b) of 19 U.S.C. § 1504 authorizes Customs to extend the liquidation period for a drawback claim by up to three years, for a possible total of four years.  The subsection similarly addresses extension of the liquidation period for import entries.  19 U.S.C. § 1504(b); *see also* n.11, *supra*.

Of the 17 Drawback Claims that remain at issue in this action,[14] roughly half were filed

between 1996 or 1997 and 1998 or 1999, with the remainder filed between 2001 and December 3,

2004.  Transcript of Oral Argument at 3-4 ("Tr.") (counsel for Ford); Defs.' Response Brief at 1

(indicating that dispute involves Drawback Claims filed "between 1996 and 1998 and between 2001

and 2004").[15]  Ford sought and received accelerated payment on all 17 of the Drawback Claims.

---

[14]After filing suit, Ford discovered that Customs already had affirmatively liquidated five of the drawback claims identified in the company's original Complaint.  In their papers, the parties have referred to these claims as the "Group I" claims.  The parties previously agreed to sever and dismiss these claims from this action, for lack of subject matter jurisdiction.  *See* Ford Motor I, 35 CIT at ____, 806 F. Supp. 2d at 1331-32; Pl.'s Brief at 3-4 & n.3 (listing drawback entry numbers of Group I claims); Defs.' Response Brief at 5.

The five "Group II" claims at issue are Drawback Claims that Customs purports to have affirmatively liquidated after this action was commenced.  *See* Ford Motor I, 35 CIT at ____, ____, 806 F. Supp. 2d at 1331-32, 1337-38 (discussing Group II claims, noting that "[j]urisdiction over Customs' actions is measured at the time the summons is filed" (quoting Washington Int'l Ins. Co. v. United States, 25 CIT 207, 218, 138 F. Supp. 2d 1314, 1326 (2001)), and holding that, "[b]ecause the court had jurisdiction [over the Group II claims] then, it has jurisdiction now"); Pl.'s Brief at 4-5 & n.4 (listing drawback entry numbers of Group II claims); *id*. at 26-27; Defs.' Response Brief at 5-6 & n.5 (listing drawback entry numbers of Group II claims).  In this action, Ford seeks (among other things) a permanent injunction "mandating the restoration to unliquidated status" of these five Drawback Claims.  *See* Complaint, at 3 (Preliminary Statement); Pl.'s Brief at 26-28.

The three "Group III" claims are Drawback Claims that Customs was preparing to liquidate when this action was filed.  Customs has voluntarily agreed not to liquidate these Drawback Claims during the pendency of this action, including any appeals.  *See* Pl.'s Brief at 4-5 & n.5 (listing drawback entry numbers of Group III claims); Defs.' Response Brief at 6 & n.6 (same).

In its Complaint, Ford defined the "Group IV" claims broadly as consisting of "all drawback claims filed by Ford prior to December 3, 2004, which were not affirmatively liquidated by Customs prior to December 3, 2005."  *See* Complaint, at 3 (Preliminary Statement).  Ford has identified nine such claims.  *See* Pl.'s Brief at 4-5 & n.6 (listing drawback entry numbers of nine Group IV claims); Defs.' Response Brief at 6 & n.7 (same).

[15]Ford's representations as to the filing dates of its 17 Drawback Claims have been all over the map.  *Compare* Complaint, at 2 (Preliminary Statement) (asserting that "[a]ll of the Drawback Claims at issue in this case were filed . . . between 1996 and 1998"); *id*. ¶ 7 (asserting that

Pl.'s Brief at 3; Defs.' Response Brief at 4 & n.3; 19 C.F.R. § 191.92 (setting forth the requirements

for accelerated payment).  Thereafter, for a period of years (and, in the case of Ford's early-filed

Drawback Claims, for nearly a decade), it was radio silence.  Customs had no communication with

Ford concerning any of the 17 Drawback Claims; and – because all of the Drawback Claims were

filed before December 3, 2004 and because they remained unliquidated one year later – Ford

considered all 17 of the Drawback Claims to have been deemed liquidated by operation of law on

December 3, 2005, pursuant to 19 U.S.C. § 1504(a)(2)(C).  Pl.'s Brief at 3.

In 2008, however, Ford learned that Customs was in the process of reviewing a number of

Ford's old drawback claims.  Pl.'s Brief at 1.  Then, in 2009, Customs began to affirmatively

---

"[b]etween 1996 and 1997, Ford filed the Drawback Claims at issue in this lawsuit"); *id.* ¶ 9 (asserting that "the latest of the subject Drawback Claims" was filed in 1998); *id.* ¶¶ 20-21 (referring to "Ford's drawback claims from 1996-1997" and "its 1996-1997 drawback claims"); *id.* ¶ 54 (asserting that "each of the Drawback Claims was filed between 1996 and 1997"); *id.* at Exh. D at Att. A (listing, *inter alia*, Group II and Group III Drawback Claims, and specifying filing dates in 1997 and 1998); *id.* at Exh. G at Att. A (same); Pl.'s Brief at 1 (asserting that Drawback Claims were filed "in the mid to late 1990s"); *id.* at 3 (asserting that Drawback Claims were filed "[b]etween 1996 and 1998"); *id.* at 6 (asserting that "the latest" of the Drawback Claims "was filed in 1999"); *id.* at 16 (referring to "Ford's 1996-1997 Drawback Claims"); *id.* at 18 (asserting that "Ford filed the Group II Claims and the Group III Claims in 1997 and 1998" and that the Group IV Claims were filed "from 2001 to 2004"); *id.* at 20 (asserting that"[w]ith the exception of the Group IV claims, all of the Drawback Claims were filed between 1997 and 1999"); Pl.'s Reply Brief at 8-9 (asserting that "[i]t is undisputed that Ford filed the Group II Claims and the Group III Claims in 1997 and 1998" and that "[i]t is similarly undisputed that Ford filed the Group IV Claims from 2001 to 2004"); Pl.'s Supp. Brief at 4 (asserting that "all of the Drawback Claims at issue were filed between 1996 and 1999"); Ford's Reply to Defendants' Supplemental Briefing at 1 ("Pl.'s Supp. Response Brief") (asserting that "[i]t is undisputed that Ford filed the Drawback Claims at issue . . . between 1996 and 1998"); Tr. at 3-4 (asserting that "Ford filed the majority of the [drawback] claims that are at issue . . . in 1997 and 1998," and that "[t]here were some later [drawback] claims that were filed in 2001 and 2004").

For purposes of the analysis and disposition here, however, it is enough to note simply that all 17 of the Drawback Claims were filed before December 3, 2004 – a fact that is not in dispute.

liquidate them.  In some instances, the drawback claims were liquidated as "no change."  But, in

other instances, the drawback claims were liquidated adversely to Ford, and Customs issued bills

for duties demanding that Ford refund the portion of the accelerated drawback that had been

previously paid to Ford which Customs now claimed to be excess.  *Id*. at 1, 21; Defs.' Response

Brief at 5.

    Among other things, Customs also has threatened that Ford may be subject to "national

sanctions," and has cautioned the company that it may be required to file "live entry" and to obtain

a "new continuous bond with an increased bond liability amount."  Ford Motor I, 35 CIT at _____

& n.13, 806 F. Supp. 2d at 1337 & n.13 (discussing threat of placement on national sanctions list);

Second Amended Complaint for Injunctive and Declaratory Relief ("Complaint") ¶¶ 29-30, 32-33

(summarizing Customs communications warning of possible requirement to file "live entry" and to

obtain new continuous bond with increased liability coverage, as well as threat of placement on

national sanctions list).[16]

    As summarized above, Customs' interpretation of 19 U.S.C. § 1504(a)(2) – memorialized

in four internal Customs memoranda included in the record – is that a drawback claim that was filed

---

[16]Ford's original Complaint explained that "[b]eing placed on sanctions means that [an] importer must pay cash at the time for entry for all importations into the United States."  [Original] Complaint for Injunctive and Declaratory Relief ¶ 29.  According to Ford, as of that time (in 2009), the company was paying "approximately $38 million in duties every year." *Id*.; *see also* Complaint at Exh. M ¶ 7 (Declaration of Paulsen K. Vandevert, Esq.) (explaining that importers on national sanctions list "must pay in cash all estimated duties, taxes, fees and charges due on the entry at the time of importation").  The requirement to file "live entry" is similarly onerous – "the practical equivalent [of] national sanctions, except that Customs defines 'live entry' to require filing all necessary documents, including the entry summary . . . , in addition to making cash deposit of estimated duties, at the time of importation." *Id*.; *see also* Complaint ¶ 30 (defining "live entry," citing Complaint at Exh. L (CBP Form 7501 Instructions)).

prior to December 3, 2004 cannot be deemed liquidated unless either (1) all of the import entries on

which the drawback claim is based were liquidated and final as of December 3, 2005, or (2) the

importer requests that the drawback claims be deemed liquidated in accordance with the procedures

set forth in 19 U.S.C. § 1504(a)(2)(B).  *See, e.g.*, Defs.' Response Brief at 3, 7; *id*. at 15 (citing

Administrative Record at pp. 1-20 ("A.R.")); Pl.'s Brief at 5-6.[17]  It is undisputed that Ford has never

requested that the Drawback Claims at issue here be deemed liquidated in accordance with 19

U.S.C. § 1504(a)(2)(B).  *See, e.g.*, Defs.' Response Brief at 3-4, 7.  And, according to Customs, as

to each of the Drawback Claims at issue, at least one underlying import entry remained unliquidated

---

[17]The four Customs memoranda in the record are:  (1) Customs Memorandum (April 10, 2007) (stating, *inter alia*, that "[a] drawback claim is subject to deemed liquidation when all of the underlying consumption entries are liquidated and final within one-year of the drawback claim being filed") (A.R. at pp. 1-5); (2) Customs Memorandum (August 31, 2006) (same) (A.R. at pp. 6-8); (3) Customs Memorandum (March 14, 2006) (stating, *inter alia*, that "[c]laims that were not eligible to deem liquidate[d] one year from the date of enactment are subject to deemed liquidation one year from the date of claim filing, when all of the underlying consumption entries are liquidated and final on the one year anniversary of the claim filing") (A.R. at pp. 9-14); and (4) Customs Memorandum (April 4, 2005) (stating, *inter alia*, that "any unliquidated drawback claim where all the underlying consumption entries which are designated on the claim and/or on the underlying Certificates of Manufacture to that claim were liquidated as of December 3, 2004, will deem liquidated on December 3, 2005, unless CBP [*i.e.*, Customs] liquidates such claims beforehand") (A.R. at pp. 15-20).

*See also* HQ H024645 (Dec. 1, 2008) (stating, *inter alia*, that, "before a liquidation by operation of law can occur [with respect to a drawback claim], all import entries on which the [drawback] claim is based must themselves have been liquidated and those liquidations have become final by virtue of [19 U.S.C. § 1504(a)(2)(B)]") (cited in Defs.' Response Brief at 3-4); Complaint ¶ 14 (citing 2007 presentation by senior Customs representative at industry conference, summarizing Customs' interpretation of liquidation statute with respect to drawback claims); Answer to Second Amended Complaint for Injunctive and Declaratory Relief  ¶ 14 (similar).

as of December 3, 2005.  *See*, *e.g.*, *id*. at 2, 7, 16.[18]  Customs therefore maintains that Ford's

Drawback Claims have never been deemed liquidated.  *Id*. at 7.

Ford commenced this action seeking a declaratory judgment as to the proper interpretation

of 19 U.S.C. § 1504(a)(2) and the liquidation status of its Drawback Claims, as well as injunctive

relief precluding Customs from, *inter alia*, reviewing, affirmatively liquidating, or taking any other

such action as to the Drawback Claims.  *See* Complaint, at 24-25 (Prayer for Relief ¶¶ C-H)

(declaratory relief); *id*., at 24 (Prayer for Relief ¶¶ A-B) (injunctive relief).[19]

_____

[18]As noted above, Ford contends that, contrary to Customs' assertions, there were no underlying import entries that remained unliquidated and non-final as of December 3, 2005.  *See* n.3, *supra*.

[19]Largely parroting the language of the Administrative Procedure Act, Ford repeatedly (albeit inconsistently) states that it seeks a judgment declaring Customs' interpretation of 19 U.S.C. § 1504(a)(2) and/or Customs' actions "(a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (d) without observance of procedure required by law; (e) unsupported by substantial evidence; and (f) unwarranted by the facts" (or some other very similar formulation).  *See* 5 U.S.C. § 706(2); *see also*, *e.g.*, Pl.'s Brief at 9-10; Pl.'s Supp. Brief at 5.  However, Ford has not otherwise addressed (b) through (f) in its briefs, except in a very few instances, and then only in passing.  Any claims to such relief therefore must be deemed waived.  *See*, *e.g.*, United States v. Great American Ins. Co., 738 F.3d 1320, 1328 (Fed. Cir. 2013) (stating that "[i]t is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived"); SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319-20 (Fed. Cir. 2006) (explaining, *inter alia*, that "[the] law is well established that arguments not raised in the opening brief are waived"); Novosteel SA v. United States, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002) (holding that argument raised for the first time in reply brief was waived).

Similarly, neither Ford nor the Government has cited, much less addressed, a critical factor required for permanent injunctive relief – specifically, the inadequacy of the plaintiff's remedies at law.  *See* 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2942, pp. 44-45 (3d ed. 2013) ("Wright & Miller") (explaining that "the main prerequisite to obtaining injunctive relief is a finding that plaintiff is being threatened by some injury for which he has no adequate legal remedy"); *id*. § 2944, pp. 79-92 (analyzing "Availability of Injunctive Relief – Adequacy of the Legal Remedy"); 13 Moore's Federal Practice § 65.03, pp. 65-14 to 65-14.1 (3d ed. 2014)

## II.  Standard of Review

In an action commenced under 28 U.S.C. § 1581(i), the applicable standard of review is set

forth in the Administrative Procedure Act, at 5 U.S.C. § 706.  *See* 28 U.S.C. § 2640(e); Gilda

Industries, Inc. v. United States, 622 F.3d 1358, 1362-63 (Fed. Cir. 2010).  Under that standard, "all

relevant questions of law," including the "interpret[ation] . . . [of] statutory provisions," are subject

to judicial review to determine whether, *inter alia*, the agency's actions, findings and conclusions

---

("Moore's Federal Practice") (stating that plaintiff seeking permanent injunction must demonstrate, *inter alia*, "that remedies available at law, such as monetary damages, are inadequate"); Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156-57 (2010) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006), citing, as one of four relevant factors, "that remedies available at law, such as monetary damages, are inadequate to compensate for [plaintiff's] injury"); eBay Inc., 547 U.S. at 391 (same); Apple Inc. v. Samsung Electronics Co., 735 F.3d 1352, 1359 (Fed. Cir. 2013) (same).

For its part, Ford argues "irreparable harm," "success on the merits," "public interest," and "balance of hardships."  Pl.'s Brief at 21-26.  The Government, in turn, states that "[t]he standards for issuing a preliminary or permanent injunction are the same except for one difference: a permanent injunction requires a showing of actual success on the merits, rather than a showing of a likelihood of success on the merits as required for a preliminary injunction."  Defs.' Response Brief at 29.  Indeed, the Government's sole argument in opposition to Ford's request for permanent injunctive relief solely is its assertion that "Ford cannot demonstrate success on the merits."  *Id.*

*See generally* 11A Wright & Miller § 2942, pp. 44-45 (explaining that, "[s]ince an injunction is regarded as an extraordinary remedy, it is not granted routinely; indeed, the court usually will refuse to exercise its equity jurisdiction unless the right to relief is clear," and underscoring "the general reluctance of federal courts to . . . award injunctions in the absence of a compelling need for that form of relief," highlighting requirement that plaintiff "demonstrate that there is a real danger that the act complained of actually will take place"); 13 Moore's Federal Practice § 65.02[1], p. 65-11 (describing injunction as "an extraordinary writ, enforceable by the judicial power of contempt"); Monsanto Co., 561 U.S. at 165-66 (emphasizing that "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course," and that, "[i]f a less drastic remedy . . . [is] sufficient to redress [a plaintiff's] injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted"); Apple Inc., 735 F.3d at 1359 (quoting Monsanto Co., 561 U.S. at 165-66).

are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A); Gilda Industries, 622 F.3d at 1363; see also Verizon California, Inc. v. FCC, 555 F.3d

270, 273 (D.C. Cir. 2009) (explaining that, "as with all agency actions subject to the Administrative

Procedure Act," an agency's statutory interpretations "must not be arbitrary and capricious").

Under the familiar Chevron framework, an agency's statutory interpretations are reviewed

using a two-step analysis, examining first "whether Congress has directly spoken to the precise

question at issue." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837,

842 (1984). If so, the court "must give effect to the unambiguously expressed intent of Congress."

Id. at 842-43. On the other hand, "if the statute is silent or ambiguous with respect to the specific

issue," the analysis proceeds to the second step, where "the question for the court is whether the

agency's answer is based on a permissible construction of the statute." Id., 467 U.S. at 843.

The Supreme Court has emphasized that "[t]he judiciary is the final authority on issues of

statutory construction and must reject administrative constructions which are contrary to clear

congressional intent." Chevron, 467 U.S. at 843 n.9. Thus, "[i]f a court, employing traditional tools

of statutory construction, ascertains that Congress had an intention on the precise question at issue,

that intention is the law and must be given effect." Id.

## III.  Analysis

The Government maintains that Customs properly interpreted 19 U.S.C. § 1504(a)(2) in

ruling that Ford's Drawback Claims were not deemed liquidated on December 3, 2005 under

subparagraph (C) of the statute. According to Customs and the Government, Ford's Drawback

Claims were not subject to subparagraph (C), because (according to Customs) each of the Drawback

Claims had at least one underlying import entry which was unliquidated and not final as of December 3, 2005.  Customs and the Government contend that Ford's Drawback Claims instead were subject to subparagraph (B) of the statute, such that the Drawback Claims could be deemed liquidated only if Ford complied with the requirements specified in that provision (which Ford has not done).

As explained below, however, the Government's position is without merit.  The construction of subparagraph (C) that is advocated by Customs and the Government cannot be reconciled with the plain language of that provision – or, for that matter, with the statute's legislative history.  Nothing in the language of subparagraph (C) even hints that the deemed liquidation of drawback claims thereunder is dependent in any way on the liquidation status of the import entries on which the drawback claims are based.  Indeed, subparagraph (C) does not even allude to import entries.  The interpretation that Customs and the Government give subparagraph (C) thus could be sustained only if one were to conclude that Congress did not mean what it unambiguously and unequivocally said.

Subparagraph (C) could not be more definitive or more clear.  All drawback claims as to which liquidation was not final on December 3, 2004 which were not affirmatively liquidated by Customs within one year thereafter became deemed liquidated on December 3, 2005, without regard to the liquidation status of the underlying import entries.  *See* 19 U.S.C. § 1504(a)(2)(C).  Ford's Motion for Judgment therefore must be granted.

A.  <u>Overview of the Basic Structure and Operation of 19 U.S.C. § 1504(a)(2)</u>

Congress designed the three subparagraphs of the statutory provision at issue – 19 U.S.C.

§ 1504(a)(2) – to comprehensively address the liquidation of drawback claims, providing both a

timetable for Customs' *affirmative liquidation* of drawback claims, and, for the first time, expressly

providing for the *deemed liquidation* of drawback claims.  Moreover, mindful of the mounting

numbers of drawback claims that were then pending before Customs (and the negative impact of the

attendant contingent liabilities that hung indefinitely over the heads of importers and others in the

international trade community), Congress both put in place a one-time mechanism for the swift

resolution of the *then-existing* (*i.e.*, *pre-December 3, 2004*, or *pre-enactment*) *drawback claims* and,

in addition, established a framework for the liquidation of all *future* (*i.e.*, *post-enactment*) *drawback*

*claims*.

<u>Subparagraph (A)</u>.  The parties are in agreement that subparagraph (A) of the statute

(captioned "In general") sets forth the basic rule that – on a prospective basis (*i.e.*, as to drawback

entries or claims filed on or after the December 3, 2004 effective date of the statute) – any such

drawback entry or claim that is "not liquidated within 1 year from the date of entry or claim shall

be deemed liquidated at the drawback amount asserted by the claimant or claim," subject to a limited

number of specified exceptions.  *See* 19 U.S.C. § 1504(a)(2)(A); *see generally* Pl.'s Brief at 11

(summarizing Ford's understanding of subparagraph (A)); Defs.' Response Brief at 11 (same, as to

Government and Customs).  In particular, pursuant to the express terms of subparagraph (A), the

general rule set forth in that subparagraph does not apply if Customs properly extends the liquidation

period, or if liquidation is suspended by statute or by court order.  19 U.S.C. § 1504(a)(2)(A).

The general rule set forth in subparagraph (A) also is not applicable if subparagraph (B) or subparagraph (C) applies.  *See* 19 U.S.C. § 1504(a)(2)(A).  As discussed in greater detail below, the general focus of subparagraph (B) is drawback entries or claims where the underlying import entries have not yet been liquidated and become final.  *See* 19 U.S.C. § 1504(a)(2)(B).  In contrast, the focus of subparagraph (A) is on drawback entries or claims that are (in Customs' shorthand) "workable" – *i.e.*, drawback entries or claims where the liquidation of the underlying import entries has become final.  Subparagraph (C), in turn, is addressed to drawback entries or claims that were "filed before December 3, 2004, the liquidation of which is not final as of December 3, 2004."  *See* 19 U.S.C. § 1504(a)(2)(C).

Subparagraph (A)'s cross-reference to subparagraph (C) – the effect of which is to carve out an exception to subparagraph (A) for drawback entries or claims that were filed before December 3, 2004 – ensures that the general rule of subparagraph (A) operates only prospectively.  Absent that carve-out, unliquidated drawback entries and claims that were filed before December 3, 2004 could have been deemed liquidated retroactively, pursuant to subparagraph (A), as of "1 year from the date of [the] entry or claim."  *See* 19 U.S.C. § 1504(a)(2)(A).  The parties agree that subparagraph (A) has no relevance in the case at bar.

Subparagraph (B).  In general, subparagraph (B) of the statute (captioned "Unliquidated imports") operates to give parties the option of having their so-called "non-workable" drawback entries and claims deemed liquidated, notwithstanding underlying import entries that are unliquidated and not yet final, provided that a party "deposit[s] . . . estimated duties on the unliquidated imported merchandise" and files with Customs "a written request for the liquidation

of the drawback entry or claim."  19 U.S.C. § 1504(a)(2)(B).  The statute mandates that any such

written request "must include a waiver of any right to payment or refund under other provisions of

law" (*id.*), to ensure that duties will not be refunded to the importer via other means (such as a

protest of the liquidation).  *See generally* Defs.' Response Brief at 19-21 (discussing in detail the

potential for "double refund of duties paid on an import entry," and citing HQ H024645 (Dec. 1,

2008) (summarizing the potential for "a refund of the duty on the same merchandise to be paid

twice" and highlighting the protection provided by the waiver required under subparagraph (B)));

Defs.' Response Brief at 10 (similar).  Subparagraph (B) applies generally to drawback entries and

claims where one or more of the import entries that underlie the drawback entry or claim "have not

been liquidated and become final within the 1-year period described in subparagraph (A)" (*i.e.*,

"within 1 year from the date of the [drawback] entry or claim") or "within the 1-year period

described in subparagraph (C)" (*i.e.*, within the one-year period preceding December 3, 2005).  19

U.S.C. § 1504(a)(2)(A)-(C); *see generally* Pl.'s Brief at 11-12 (summarizing Ford's understanding

of subparagraph (B)); Defs.' Response Brief at 12 (same, as to Government and Customs).

     As noted above, the Government contends that the Drawback Claims at issue here fall within

subparagraph (B) of the statute, because – according to the Government – each of the Drawback

Claims had one or more underlying import entries that had not been liquidated and become final,

and – according to the Government – such drawback claims are covered only by subparagraph (B).

*See*, *e.g.*, Defs.' Response Brief at 7.  By contrast, Ford maintains that its Drawback Claims fall

squarely within subparagraph (C).  *See*, *e.g.*, Pl.'s Brief at 1-2, 3, 12, 25.

Subparagraph (C).  Subparagraph (C) (captioned "Exception") is retrospective in scope.  19

U.S.C. § 1504(a)(2)(C).  Specifically, subparagraph (C) applies only to those drawback entries or

claims that were "filed before December 3, 2004" (the effective date of the statute) and as to which

liquidation was not final as of that date.  *Id*.  Under subparagraph (C), all such drawback entries and

claims "[were] deemed liquidated" on the one-year anniversary of enactment (*i.e.*, on December 3,

2005) at the amounts asserted by the claimants in the respective drawback entries and claims.  *Id*.

The aspects of the statute outlined above are not at issue.  The merits of the parties' positions

on points in dispute are analyzed in detail below.

### B.   The Merits of the Parties' Competing Readings of the Statute

According to Customs, deemed liquidation under subparagraph (C) of 19 U.S.C. § 1504(a)(2)

applies to drawback claims that are specifically described by that subparagraph – *i.e.*, pre-enactment

drawback claims that had not been liquidated as of December 3, 2004, and which remained

unliquidated on December 3, 2005 – but only to the extent that all import entries underlying those

drawback claims had been liquidated and become final as of December 3, 2005.  *See, e.g.*, Tr. at 39

(counsel for Government argues that subparagraph (C) applies only to drawback claims that were

"workable"); Defs.' Response Brief at 2-3, 7, 12 (same).   In other words, Customs reads into

subparagraph (C) a restrictive condition that appears nowhere in the language of that provision.

Customs contends that, as to any pre-enactment drawback claims with underlying import

entries that were not yet liquidated and final on December 3, 2005, "deemed liquidation is provided

for only by subparagraph (B) and only to the extent provided in that subparagraph."   Defs.'

Response Brief at 12; *see also id*. at 7, 15.  Because – according to Customs – each of Ford's

Drawback Claims had one or more underlying import entries that had not been liquidated and become final as of December 3, 2005, Customs asserts that the Drawback Claims could only have been deemed liquidated under subparagraph (B), and "equally by operation of the statute, [the Drawback Claims] do not fall within the scope of [subparagraph (C)]." Defs.' Response Brief at 12; Defs.' Supp. Brief at 1-2; Defendants' Supplemental Response Brief Pursuant to the Court's June 17, 2013 Order at 5-6 ("Defs.' Supp. Response Brief"); *see also* Defs.' Response Brief at 7, 9, 15; Defs.' Supp. Brief at 8-9; Defs.' Supp. Response Brief at 3, 11-12.

It is undisputed that Ford did not fulfill the requirements set forth for deemed liquidation under subparagraph (B), including depositing estimated duties on unliquidated import entries, filing a written request for liquidation of the drawback claims, and waiving any rights to payment or refund under other provisions of law.  Defs.' Response Brief at 3-4, 7, 12-13, 15; 19 U.S.C. § 1504(a)(2).  Customs therefore maintains that Ford's Drawback Claims have never been deemed liquidated.  Defs.' Response Brief at 12; Defs.' Supp. Brief at 2, 9; Defs.' Supp. Response Brief at 5-6, 11-12.

As Ford explains, however, Customs' construction of 19 U.S.C. § 1504(a)(2) cannot be squared with the plain language of the statute.  Pl.'s Brief at 1-2, 5-6, 9-10; Pl.'s Reply Brief at 4-5; Pl.'s Supp. Brief at 10; Ford's Reply to Defendants' Supplemental Briefing at 3-4 ("Pl.'s Supp. Response Brief").[20]  In particular, Customs strains mightily to read into the text of subparagraph (C)

---

[20]In an effort to underscore the assertedly "absurd" and "manifestly unjust" nature of the Government's interpretation of the statute (*see* Pl.'s Reply Brief at 7), Ford highlights the implications of the Government's position that the 17 Drawback Claims at issue fall exclusively within subparagraph (B) of 19 U.S.C. § 1504(a)(2).  *See, e.g.,* Defs.' Response Brief at 3 (asserting that a pre-enactment drawback claim "cannot become deemed liquidated unless [the liquidation of] all of the import entries on which the drawback claim is based [was] final as of December 3, 2005,

---

or unless the importer requests that the drawback [claims] be deemed liquidated pursuant to [subparagraph (B)]"). Ford emphasizes that the Government not only maintains that the Drawback Claims were not deemed liquidated pursuant to subparagraph (C) on December 3, 2005 (due to underlying import entries that allegedly were not liquidated and final on that date), but, in addition, the Government contends that thereafter there was no statutory restriction on the time for Customs' action on such drawback claims.  *See, e.g.*, Pl.'s Reply Brief at 7 (arguing that "Customs' interpretation of the statute . . . leav[es] a set of drawback claims of which Ford's Drawback Claims are representative with no time limit at all for Customs to take action"); Tr. at 55-57 (counsel for the Government arguing, *inter alia*, that "there is a loophole in the statute," such that there is no statutory time limit for Customs' processing of pre-enactment drawback claims which had underlying import entries that were not liquidated and final before December 3, 2005).

In other words, according to the Government, as to pre-enactment drawback claims that were not deemed liquidated on December 3, 2005, Customs remained free under the statute to take as long as it wished thereafter to liquidate those claims, and a drawback claimant's sole recourse was to seek deemed liquidation under subparagraph (B) by complying with the requirements specified there.  *See, e.g.*, Tr. at 55-57 (counsel for the Government arguing, *inter alia*, that "there is a loophole in the statute," such that there is no statutory time limit for Customs' processing of pre-enactment drawback claims which had underlying import entries that were not liquidated and final before December 3, 2005); *id.* at 24-25 (counsel for Ford, arguing that, per Government's interpretation of statute, "there's no deadline for liquidating [a pre-enactment drawback claim that was not deemed liquidated on December 3, 2005] . . . because an underlying [import] entry was . . . [unliquidated on] December 3, 2005 so [subparagraph (C)] doesn't apply.  And what happens to the [drawback] claim? Nothing.  It goes back into the twilight zone where it can languish for years and years"); *id.* at 25 (counsel for Ford, arguing that "Customs' interpretation of the statute is . . . creating [an] absurdity because they have the opinion that as long as there was an underlying consumption entry that was open . . . when the clock strikes 12:00 on December 3, 2005, we've made it over the hurdle," and "it's back to status quo" and "we'll just take as much time as we need to liquidate that [pre-enactment drawback] claim"); *id.* at 34-35 (counsel for Ford, asserting that, under Government's reading of statute, "all bets are off" as to time limits for liquidation of any pre-enactment drawback claim that (according to the Government) was not deemed liquidated on December 3, 2005).

Ford dismisses any such interpretation of the statute – which would leave a body of pre-enactment drawback claims languishing before Customs indefinitely – as "wholly inconsistent with the express language of § 1504(a)(2)(C)" and "contrary to the manifestly obvious Congressional purpose in enacting the statute, which was to eliminate aging drawback claims to bring certainty and finality to the business operations of drawback claimants."  Pl.'s Reply Brief at 1-2; *see also id.* (arguing that Congress could not have intended to allow pre-enactment drawback claims to continue to languish after December 3, 2005, "escap[ing] any time limit on Customs to liquidate"); *id.* at 7 (asserting that Customs' interpretation of statute "is in direct contravention to the purpose and legislative history of the [2004] amendments"); Tr. at 34-35 (counsel for Ford, arguing that effect

a drawback claim "workability" requirement that simply is not there.  In the process, Customs (and

the Government) misread both subparagraph (B) and subparagraph (C) alike.[21]

The Government argues that subparagraph (A) "sets out a general rule concerning deemed

liquidation of drawback claims, subject to the exceptions 'provided in subparagraph (B) or (C).'"

Defs.' Supp. Response Brief at 6 (quoting 19 U.S.C. § 1504(a)(2)(A)).  Asserting that "[t]he

question presented by this litigation is the relationship between subparagraphs (B) and (C)," the

Government posits that "[a]s between the two [subparagraphs], . . . subparagraph (B) controls any

time the designated or identified import entries have not been liquidated and become final within

the 1-year period from December 3, 2004 through December 3, 2005 ('the 1-year period described

in subparagraph (C)')."  *Id*.  The Government accuses Ford of construing subparagraph (C) "in

isolation" and "ignor[ing] the existence and significance" of subparagraph (B).  Defs.' Response

Brief at 17; Defs.' Supp. Response Brief at 4.  According to the Government, "[w]hen a drawback

---

of Government's reading of statute – leaving body of pre-enactment drawback claims with no deadline for liquidation – is "contrary to the whole reason that Congress amended this law . . . in the first place").

Elsewhere, in the context of one of its alternative theories of the case, Ford argues that, to the extent that any pre-enactment drawback claims were not deemed liquidated on December 3, 2005 due to underlying unliquidated import entries, such drawback claims would be deemed liquidated one year after the underlying import entries were liquidated, pursuant to subparagraph (A) of the statute.  19 U.S.C. § 1504(a)(2)(A) (setting forth general rule governing deemed liquidation of drawback claims, subject to specified exceptions); *see also*, *e.g.*, Pl.'s Reply Brief at 9 (arguing, in context of alternative theory of case, that, "[p]ursuant to § 1504(a)(2)(A), all of Ford's Drawback Claims liquidated by operation of law one year after the last underlying consumption [*i.e.*, import] entry liquidated"); Pl.'s Supp. Brief at 5 (same); n.26, *infra* (discussing Ford's alternative arguments, including its reliance on subparagraph (A)).

[21]In light of the clarity and lack of ambiguity of the text of subparagraph (C), there is no real need to reach the language of subparagraph (B), except to address the arguments advanced by Customs and the Government.

claim falls squarely within the scope of subparagraph (B), subparagraph (C) cannot override (B) and force a deemed liquidation when the requirements of subparagraph (B) have not been met (*i.e.*, the deposit, liquidation request, and waiver requirements)." *Id*. at 6.

But neither Customs nor the Government identifies any ambiguity in the plain language of subparagraph (C), on which Ford relies.  And the language in subparagraph (B) on which Customs and the Government rely – referring to "the 1-year period described in subparagraph (C)" – performs a function that is entirely different than what Customs and the Government claim.

Contrary to the assertions of Customs and the Government, subparagraph (B) operates prospectively only and has no effect on the deemed liquidation of pre-enactment drawback claims (including the 17 Drawback Claims at issue here), which are governed solely by subparagraph (C). Subparagraph (B)'s reference to "the 1-year period described in subparagraph (C)" – like subparagraph (B)'s parallel reference to "the 1-year period described in subparagraph (A)" – merely defines a time frame in non-calendar terms (as legislators often are forced to do).

Nothing in the text of subparagraph (B) plausibly can be construed to place a limitation on the operation of subparagraph (C).  Contrary to the claims of Customs and the Government, the reference in subparagraph (B) to "the 1-year period described in subparagraph (C)" did not (and was not intended to) impose a condition on deemed liquidation pursuant to subparagraph (C), a provision that is, on its face, unambiguous, unequivocal, and without restriction, limitation, reservation, or qualification.  Instead, the effect of the reference to "the 1-year period described in subparagraph (C)" at the beginning of subparagraph (B) was to ensure that, under any conceivable scenario, Customs had a minimum of at least one year from the enactment of the statute to review and take

appropriate action on drawback claims (including review of the unliquidated, non-final import entries associated with them) before any party could avail itself of the option of demanding deemed liquidation of a drawback claim pursuant to subparagraph (B).

Thus, for example, absent subparagraph (B)'s reference to "the 1-year period described in subparagraph (C)," any party with a drawback claim as to which there were underlying import entries that were unliquidated and not final would have had the option of invoking subparagraph (B) to demand deemed liquidation of that drawback claim *as early as the effective date of the statute – i.e.*, as early as December 3, 2004 (the date of the statute's enactment).[22]  As such, the reference to "the 1-year period described in subparagraph (C)" operates not as a limitation on deemed liquidation under subparagraph (C) (as Customs and the Government contend), but, rather, was designed to afford Customs a measure of protection by ensuring that deemed liquidation pursuant to subparagraph (B) (*i.e.*, deemed liquidation at the option of a drawback claimant) could take place no sooner than deemed liquidation pursuant to subparagraph (C) (*i.e.*, the statutorily-prescribed deemed liquidation of pre-enactment drawback claims that remained unliquidated as of December 3, 2005) – that is, no sooner than December 3, 2005.  In other words, Congress sought to ensure that, under both subparagraphs (B) and (C), Customs had a transition period of one year to adapt to the new regime for deemed liquidation of drawback claims – a year for Customs to get its house in order.

---

[22]Given the agency's backlog of aging drawback claims at that time, it is not difficult to imagine that – but for subparagraph (B)'s reference to "the 1-year period described in subparagraph (C)" – Customs might well have found itself buried under an avalanche of demands for deemed liquidation of drawback claims under subparagraph (B) beginning in early December 2004, before the agency even had a chance to promulgate any necessary revisions to its regulations, policies, and procedures, and thwarting any agency efforts to review in an orderly and expedited fashion the pre-enactment drawback claims that Congress made otherwise subject to deemed liquidation under subparagraph (C).

Customs and the Government thus cannot graft onto subparagraph (C) a restriction limiting deemed liquidation under that provision to only those pre-enactment drawback claims that were (in Customs' lingo) "workable" (*i.e.*, drawback claims where all underlying import entries were liquidated and final) as of December 3, 2005.  As discussed above, Customs and the Government misread the language in subparagraph (B) on which they rely.  And, more importantly, the language of subparagraph (C) admits of no ambiguity.  On its face, the plain language of subparagraph (C) provides for the deemed liquidation of any drawback claim filed before December 3, 2004, "the liquidation of which [was] not final as of December 3, 2004."  *See* Pl.'s Supp. Response Brief 4.  Unlike subparagraph (B), subparagraph (C) makes no mention of underlying import entries.  Thus, as Ford emphasizes, the language of subparagraph (C) "is not qualified or restricted in any way, and is without limitation with respect to the liquidation status of underlying [import] entries." Pl.'s Brief at 12; *see also id*. at 13; Pl.'s Reply Brief at 2, 4-5; Pl.'s Supp. Brief at 9-10; Pl.'s Supp. Response Brief at 3-4.  Although Congress surely could have limited deemed liquidation under subparagraph (C) to so-called "workable" drawback claims, Congress conspicuously did not do so.

In short, without regard to the status of underlying import entries, the plain and unambiguous language of subparagraph (C) mandated that Customs had exactly one year (*i.e.*, from December 3, 2004 to December 3, 2005) in which to liquidate drawback claims that were filed before December 3, 2004 as to which liquidation was not final as of that date, including (but not limited to) Ford's Drawback Claims.  As of December 3, 2005, all such claims that Customs had not affirmatively liquidated (for whatever reason) – including the Drawback Claims at issue here – were deemed liquidated by operation of law, at the amounts asserted by the claimants.

The Government cautions that giving subparagraph (C) its "plain meaning" reading will lead to unintended and untoward consequences.  But none of the Government's arguments and concerns can trump the clear and unambiguous language of that provision.

The Government first hypothesizes "a situation where a claimant can file a claim, [Customs] makes preliminary refund in an accelerated payment based solely on what was asserted by the claimant, the claimant refuses to file a waiver and the claim is deemed liquidated simply because the underlying import entries have not liquidated."  Defs.' Response Brief at 17.  The Government argues that Customs thus will be "strip[ped] . . . of its ability to review the accuracy of the claim," a result that the Government asserts is contrary to the statute.  *Id*.  In fact, however, as Ford points out, the "plain meaning" reading of subparagraph (C) does not strip Customs of its ability to review the accuracy of any drawback claims, except to the extent expressly contemplated by Congress.

In other words, as to drawback claims like those at issue – filed before December 3, 2004 – Congress gave Customs one full year in which to review the accuracy of the claims and to decide whether to affirmatively liquidate them at amounts other than those claimed at the time of the filing of the drawback claim.  Here, it was Customs' choice not to review and affirmatively liquidate Ford's Drawback Claims within the one-year period established by Congress.[23]

---

[23]The Government stresses that some import entries may remain suspended for a matter of years, pursuant to statute and/or court order, due to ongoing antidumping and/or countervailing duty proceedings.  *See* Defs.' Supp. Brief at 6-7, 8-9; Tr. at 40, 54, 58.  The Government even goes so far as to suggest that many (if not most) of the underlying import entries that had not been liquidated in this case were suspended due to antidumping and/or countervailing duty proceedings, although there is no record evidence to that effect.  *See* Defs.' Response Brief at 24; Defs.' Supp. Brief at 15 n.6; Tr. at 50-51, 58, 70, 75-77.  *But see* Pl.'s Supp. Response Brief at 8-9 (challenging Government's claim that import entries underlying Drawback Claims remained unliquidated due to antidumping and/or countervailing duty proceedings); Tr. at 62-63, 65-66 (counsel for Ford, arguing same).

(As an aside, the sole record evidence bearing on this point is a September 2009 letter from Customs, in which the agency stated that it was "unable" to liquidate two of Ford's Drawback Claims because specified underlying import entries could not be liquidated "due to pending antidumping/countervailing duty instructions."  Letter from Customs (Sept. 10, 2009) (A.R. at p. 210); *see also* Defs.' Response Brief at Exh. 3 (citing drawback entries [*i.e.*, Drawback Claims] and import entries referenced in September 2009 letter from Customs).  The Government later corrected factual misstatements in that letter, explaining that the import entries in question in fact had been deemed liquidated, in September 2006.  *See* Defs.' Supp. Brief at 15 n.6; *see also* Pl.'s Supp. Response Brief at 9-10, 14 (discussing Government's correction of factual misstatements in September 2009 letter from Customs).  The Government maintains that the factual error has no effect on its analysis, however, because – according to Customs and the Government – the import entries were not liquidated as of December 3, 2005.  Defs.' Supp. Brief at 15 n.6.  The parties have continued to dispute both the truth of the asserted facts and their implications.  *See*, *e.g.*, Pl.'s Brief at 7 n.8 (discussing September 2009 letter from Customs); Tr. at 13-16, 63-69 (counsel for Ford); Tr. at 50 (counsel for the Government).)

The Government intimates that, to the extent that Customs could not liquidate underlying import entries while the import entries were suspended due to antidumping and/or countervailing duty proceedings, Customs' hands were tied with respect to Ford's Drawback Claims through December 3, 2005, and beyond.  Reading between the lines, the Government also appears to suggest that Congress could not possibly have intended to provide for the deemed liquidation of drawback claims under subparagraph (C) if Customs could not have liquidated the underlying import entries before deemed liquidation of the drawback claims occurred.  *See* Tr. at 54 (counsel for the Government).

There are, however, a number of fallacies inherent in the Government's position.  Contrary to the Government's implication, antidumping and countervailing duties are not subject to drawback. *See* 19 U.S.C. § 1677h.  The pendency of any antidumping and countervailing duty proceedings thus had no bearing whatsoever on Customs' ability to review and take appropriate action on pre-enactment drawback claims (including Ford's Drawback Claims) during the one-year period established by subparagraph (C), before those drawback claims were deemed liquidated on December 3, 2005 pursuant to that subparagraph.

As to all pre-enactment drawback claims (including those where the liquidation of underlying import entries was suspended due to antidumping and/or countervailing duty proceedings), nothing prevented Customs from reviewing those drawback claims during the statutory one-year period, comparing them to the related underlying import entries, and taking any appropriate actions (including, for example, requiring drawback claimants to sign waivers) to protect against double refunds.  If Customs failed to undertake such an analysis during the one-year period established in subparagraph (C) and allowed drawback claims to be deemed liquidated under that subparagraph in instances where the agency had already liquidated the underlying import entries and

Further, the "plain meaning" reading of subparagraph (C) will govern only the finite universe of specific cases such as this, where a drawback claim was filed prior to December 3, 2004 and Customs failed to take action on that claim before December 3, 2005 – the very circumstances envisioned by Congress in enacting subparagraph (C).   The "plain meaning" reading of subparagraph (C) clearly will not apply to any drawback claims filed after December 3, 2004, including any claims that are filed in the future.  *See generally* Pl.'s Reply Brief at 7.

Similarly unavailing is the Government's claim that the "plain meaning" reading of subparagraph (C) will somehow render subparagraph (B) "nugatory."  Defs.' Response Brief at 17-18.  *But see* Pl.'s Reply Brief at 7.  The Government asserts that, to the extent that subparagraph (B) and subparagraph (C) are carve-outs from subparagraph (A), the two subparagraphs must be read together and harmonized.  Defs.' Response Brief at 18.  Based on that principle, the Government maintains that subparagraph (C) should not be read to override subparagraph (B) so as to "force a deemed liquidation of an entry described in (B) [*i.e.*, a drawback claim with underlying import entries that have not been liquidated and become final] in circumstances where the deposit, liquidation request, and waiver requirements [of subparagraph (B)] are not met."  *Id.*

Arguing in a somewhat circular fashion, the Government contends that such an override must be avoided because, the Government claims, subparagraph (B) is the sole subparagraph under which

---

had refunded import duties (in effect, resulting in a double refund), Customs has only itself to blame. Moreover, Customs retained control of any underlying import entries that were unliquidated and not final as of December 3, 2005, when the pre-enactment drawback claims that Customs had not affirmatively liquidated during the statutory one-year period were deemed liquidated pursuant to subparagraph (C).  As to those import entries, Customs obviously was free to take any actions necessary to protect against double recovery, with the benefit of the knowledge that the related drawback claims already had been deemed liquidated.

"a drawback claim . . . [can be] deemed liquidated where the [underlying] import entries have not been liquidated and become final."  Defs.' Response Brief at 18.  The Government reasons that, "where, as here, (1) the drawback claims were filed before December 3, 2004 and the liquidation of those claims was not final as of December 3, 2004 (*i.e.*, the factual conditions for application of subparagraph (C)), and (2) the import entries [underlying the drawback claims] have not been liquidated and become final . . . (*i.e.*, the factual conditions for application of subparagraph (B)), subparagraph (B) must control, because it limits deemed liquidation to only those claims satisfying the deposit, liquidation request, and waiver requirements" imposed by subparagraph (B).  *Id.* at 18-19.  The Government's argument thus seems to be that the "plain meaning" reading of subparagraph (C) renders the protections inherent in subparagraph (B) "nugatory" as to those pre-enactment drawback claims that were deemed liquidated under subparagraph (C), despite underlying import entries that remained unliquidated. *See* 19 U.S.C. § 1504(a)(2)(B); Defs.' Response Brief at 17-19.[24]

However, this argument fundamentally misreads the statute.  Congress designated subparagraphs (B) and (C) as exceptions to the general one-year deemed liquidation rule of subparagraph (A).  Congress did not make subparagraph (B) an exception to the rule of subparagraph (C).

---

[24]In other words, the Government does not contend that the "plain meaning" reading of subparagraph (C) actually renders subparagraph (B) a complete nullity.  In particular, the Government does not contend that the "plain meaning" reading of subparagraph (C) affects in any way the application of subparagraph (B) to all post-enactment drawback claims (*i.e.*, all drawback claims arising on or after December 3, 2004).  Instead, the Government argues only that the "plain meaning" reading of subparagraph (C) renders subparagraph (B) "nugatory" as to a narrow, limited subset of drawback claims – *i.e.*, those pre-enactment drawback claims that were deemed liquidated under subparagraph (C) despite underlying import entries that remained unliquidated.  Even as to that point, however, the Government is misguided.

Lastly, in a related argument, the Government suggests that the "plain meaning" reading of subparagraph (C) "could lead to a double refund of duties paid on an import entry or place the Government in the position of choosing between two potentially eligible claimants for the same refund." Defs.' Response Brief at 19.  The Government emphasizes that "[t]he framework of [subparagraph (B)] was meant to address this situation, and ensure that a double refund of duties does not occur," by requiring drawback claimants to comply with the deposit, liquidation request, and waiver provisions of that subparagraph.  *Id*. at 20; 19 U.S.C. § 1504(a)(2)(B).

But the Government ignores the language, the purpose, and the operation of subparagraph (C).  Under that provision, Customs had one full year from the date of enactment to take any actions vis-a-vis pre-enactment drawback claims that Customs determined to be necessary to prevent double refunds; and only in the absence of Customs' affirmative liquidation of a drawback claim during the one-year period was that drawback claim deemed liquidated on the one-year anniversary of enactment.  Even more to the point, subparagraph (C) had no effect on any import entries underlying the pre-enactment drawback claims.  Customs – not the drawback claimants – retained control of the liquidation of all underlying import entries (subject only to the statutory constraints applicable to all import entries in general), and thus Customs remained free to take any measures necessary with respect to those import entries to avoid double refunds even after related drawback claims were deemed liquidated pursuant to subparagraph (C).  In sum, contrary to the Government's suggestion, nothing about subparagraph (C) precluded Customs from taking action to protect against double refunds.  *See generally* n.23, *supra* (explaining, *inter alia*, various courses of action open to

Customs, to protect against double refunds and related concerns).[25]

As discussed above, Customs does not dispute that Ford's 17 Drawback Claims were "filed before December 3, 2004." 19 U.S.C. § 1504(a)(2)(C).  Nor does Customs dispute that Ford's Drawback Claims were not liquidated and final as of that date. *Id*.  Similarly, Customs does not dispute that Ford's Drawback Claims remained unliquidated as of "the date that [was] 1 year after December 3, 2004." *Id*.  Thus, there can be no dispute that Ford's Drawback Claims are described precisely by the plain language of subparagraph (C).  Yet Customs' construction of the statute paradoxically would exclude from deemed liquidation under subparagraph (C) drawback claims (such as Ford's Drawback Claims) that even Customs and the Government concede are described with precision by that provision – an anomalous outcome, by any measure.  Neither Customs nor the Government can point to any language in subparagraph (C) to support the result that they advocate.  Nor can they leverage any language in subparagraph (B) to create an ambiguity (or "gap") in subparagraph (C) where none exists.

---

[25]Moreover, according to Ford, concerns about competing claimants and double refunds are baseless, at least in this case.  As Ford sums up the situation, "[t]he Administrative Record is devoid of any evidence that there are any parties beyond Ford competing for the refunds Ford claimed and received, under accelerated payment, many, many years ago." Pl.'s Reply Brief at 7-8; *see also* Pl.'s Supp. Response Brief at 6 (same).

In the course of oral argument, counsel for the Government asserted – for the first time – generally, and in passing, without any further detail or explanation, that "Customs looked at [some] underlying import entry . . . and confirmed that that import was not Ford's import[]," implying that perhaps Ford might not necessarily be the only party with an interest in one or more of the Drawback Claims at issue here. *See* Tr. at 41-42, 72-73.  Neither Customs nor the Government has pointed to anything on the record to substantiate such a claim, however.  And, in any event, it is much too late to raise such a point at oral argument. *Cf*. United States v. Great American Ins. Co., 738 F.3d at 1328 (holding that arguments not appropriately developed in briefing are deemed waived); SmithKline Beecham, 439 F.3d at 1319-20 (similar); Novosteel, 284 F.3d at 1273-74 (similar).

Under <u>Chevron</u>, where – as here – "Congress has directly spoken to the precise question at issue" (*i.e.*, whether the deemed liquidation of pre-enactment drawback claims under subsection (C) was dependent in any way on the liquidation status of underlying import entries), and where – as here – the language of the statute is clear, then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Chevron</u>, 467 U.S. at 842-43.

## C.  <u>The Legislative History</u>

Because the express terms of 19 U.S.C. § 1504(a)(2)(C) are clear and unambiguous on their face, there is no cause to resort to the various other tools of statutory construction to determine whether Congress intended to deem liquidated by operation of law, on December 3, 2005, drawback claims such as the Drawback Claims at issue here (whether or not there were underlying unliquidated and non-final import entries).  As the Court of Appeals has explained, "[t]o ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing <u>Chevron</u>, 467 U.S. at 843 n.9).  "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. . . . Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter." *Id*. (citations omitted).  "[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material." <u>Exxon Mobil Corp. v. Allapattah Services, Inc.</u>, 545 U.S. 546, 568 (2005).

In any event, as summarized below, there is nothing in the legislative history to cast doubt on the "plain meaning" reading of the language of 19 U.S.C. § 1504(a)(2)(C).  To the contrary, the

legislative history is fully consonant with the plain meaning of the text of that provision, evincing Congress's concern about Customs' backlog of aging drawback claims, and, in particular, Congress's desire to separately address both *future* and *existing* drawback claims, and to "wipe the slate clean" of existing drawback claims through the vehicle of subparagraph (C).   Equally significant, the legislative history is devoid of any indication that Congress intended to limit deemed liquidation under subparagraph (C) to only those drawback claims where the underlying import entries were liquidated and final as of December 3, 2005 (or, for that matter, in any other way).

The legislative history of § 1504(a)(2) (addressing the liquidation of drawback claims) is properly viewed in the context of the history of 19 U.S.C. § 1504 in general, and, in particular, the provisions governing the liquidation of import entries, on which the more recent provisions relating to liquidation of drawback claims were based.  Specifically, the Customs Procedural Reform and Simplification Act of 1978 imposed – for the first time – limitations on the time for Customs' liquidation of import entries, and provided for deemed liquidation by operation of law where Customs fails to liquidate import entries in a timely fashion.  The legislative history makes it clear that Congress' enactment of limitations on Customs' liquidation of import entries in 1978 was motivated by the same types of concerns that drove Congress to adopt similar limitations on the liquidation of drawback claims in 2004.

In introducing the 1978 Act, the Senate Committee on Finance explained that the new limitations on the liquidation of import entries were designed to "increase certainty in the customs process for importers, surety companies, and other third parties with a potential liability relating to a customs transaction."  S. Rep. No. 95-778, at 32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2211,

2243.  The Committee noted that, at that time, under the then-existing law, delays in liquidation of import entries often meant that "an importer [could] learn years after goods have been imported and sold that additional duties are due," or that an importer "[could] have deposited more money for estimated duties than [were] actually due but be unable to recover the excess for years as he await[ed] liquidation."  *Id*.

By imposing strict limits on Customs' ability to extend the period for liquidation of import entries and by providing for the deemed liquidation of such entries, Congress sought to "[e]liminate . . . unanticipated requests by Customs, many years after importation, for additional duties which often result[ed] in substantial losses to importers because they [were] unable to anticipate such duties when pricing their products."  S. Rep. No. 95-778, at 4, *reprinted in* 1978 U.S.C.C.A.N. at 2215.  The Senate Finance Committee further noted that the new limitations on Customs' liquidation of import entries were responsive to concerns expressed by "several of the countries participating in the Multilateral Trade Negotiations," which had "requested that the United States establish a time limit within which liquidation [of import entries] must occur."  *Id*. at 32, *reprinted in* 1978 U.S.C.C.A.N. at 2243.

This understanding of the purpose and effect of § 1504's limitations on Customs' liquidation of import entries has been recognized on multiple occasions by both the U.S. Court of Appeals for the Federal Circuit and this Court.  *See*, *e.g.*, Koyo Corp. v. United States, 497 F.3d 1231, 1239-40 (Fed. Cir. 2007) (noting, *inter alia*, that "Congress enacted the deemed liquidation statute to prevent Customs from belatedly assessing additional duties and from indefinitely retaining duties deposited in excess"); Ambassador Div. of Florsheim Shoe v. United States, 748 F.2d 1560, 1565 (Fed. Cir.

1984) (explaining that "the true intent of § 1504, besides relieving importers of prolonged uncertainty, was to bring the United States into conformity with international expectations interpreted to require that duty liabilities should be ascertained and fixed generally within a year after entry").

The legislative history of the 2004 amendments to § 1504 addressing the liquidation of drawback claims echoes many of the same reservations that Congress identified in 1978 with respect to the liquidation of import entries.  The history of the 2004 amendments explains that, at that time, "[e]xisting law only set[] forth a time line for the liquidation of import entries and . . . [did] not require the liquidation of drawback claims within a statutory time frame."  S. Rep. No. 108-28, at 172 (2003).  Congress voiced concern that, "[a]s a result, drawback claims [were] generally not liquidated by U.S. Customs within a reasonable period of time," and often "remain[ed] outstanding for years."  *Id.*

Congress emphasized that "without liquidation, a contingent liability for U.S. businesses [*i.e.*, drawback claimants] . . . is created for the amount of each drawback claim because U.S. Customs can challenge the drawback amount or value of the goods for which drawback was claimed until liquidation occurs."  S. Rep. No. 108-28, at 172.  Congress further noted that "[i]f drawback claims are never liquidated, for an open-ended time period the drawback claimant's claim unfairly remains subject to challenge by U.S. Customs," "creat[ing] an unwarranted liability and the possibility that the claimant will have to reimburse the U.S. Treasury any drawback monies paid to the claimant – even several years from when the claim was actually made and money was paid to the drawback claimant."  *Id.* at 172-73.

The legislative history highlights the fact that, in responding to the expressed concerns, Congress sought to address the liquidation of existing drawback claims and the liquidation of future drawback claims *separately*, drawing a bright line between the two and taking a different approach to the challenge that each presented:

> This [amendment] would remove [the] liability overhanging drawback claimants by requiring U.S. Customs (1) to liquidate *existing* drawback claims, and (2) to liquidate *future* drawback claims within a specified period of time, as U.S. Customs already does for merchandise entered for consumption [*i.e.*, for import entries].

S. Rep. No. 108-28, at 173 (emphases added).  Like the text of subparagraph (C) itself, the legislative history draws no distinction among existing (*i.e.*, pre-enactment) drawback claims based on the status of the underlying import entries.  Rather, the legislative history distinguishes only between *existing* drawback claims on the one hand (which are the subject of subparagraph (C) of § 1504(a)(2)) and *future* drawback claims on the other (which are the focus of subparagraphs (A) and (B) of that provision).

As reflected in both the text of the provision and the legislative history, Congress intended subparagraph (C) as a one-time, retrospective, transitional, clean-up provision, designed to eliminate Customs' backlog of aging drawback claims – one way or the other – no later than December 3, 2005.  Congress could have taken a more surgical approach.  For example, certainly Congress could have limited deemed liquidation under subparagraph (C) to only those drawback claims with no underlying unliquidated import entries, had it wished to do so.  Instead, however, Congress, in its wisdom, allowed Customs one year from the date of the statute's enactment to take appropriate action on all existing (*i.e.*, pre-enactment) drawback claims, providing, at the same time, for finality and repose – *i.e.*, deemed liquidation – as to all such claims that were not affirmatively liquidated by the statute's one-year anniversary.

In summary, frustrated by the history of drawback claims languishing at Customs, Congress gave the agency a limited, one-year window to "clear the decks" of all existing drawback claims. That window closed on December 3, 2005.  As of that date, any pre-December 3, 2004 drawback claims that Customs had not affirmatively liquidated – including the 17 Drawback Claims at issue here – were deemed liquidated by operation of law, pursuant to 19 U.S.C. § 1504(a)(2)(C), at the amounts asserted by the claimants.[26]

---

[26]As detailed above, Ford prevails on its statutory interpretation claim – *i.e.*, its argument that its 17 Drawback Claims were deemed liquidated on December 3, 2005 pursuant to 19 U.S.C. § 1504(a)(2)(C) without regard to the liquidation status of the underlying import entries.  There is therefore no need here to reach the company's two (similar, but legally distinct) alternative arguments, which proceed from the Government's position (rejected here) that pre-enactment drawback claims were deemed liquidated pursuant to subparagraph (C) of the statute only if all of the underlying import entries had been liquidated and those liquidations were final before December 3, 2005.

It is impossible to parse Ford's two alternative theories of the case with any degree of confidence, because the parties repeatedly confuse and conflate the two.  In general, however, one of the two alternative theories (which appears to relate to the Group II and Group III Drawback Claims, and possibly also to at least some of the Group IV Drawback Claims) contends that liquidation of the underlying import entries both (1) was not suspended by statute or court order and (2) could not have been extended beyond four years from the dates of entry.  Ford maintains that, accordingly, whether through the affirmative actions of Customs or by operation of law, all underlying import entries must have liquidated and become final before December 3, 2005.  Ford thus concludes that the status of the underlying import entries could not possibly have precluded the deemed liquidation of the Drawback Claims on December 3, 2005 pursuant to subparagraph (C) – even under the reading that Customs and the Government have given that provision.  *See* 19 U.S.C. § 1504(a)(2)(C).

Ford's second alternative argument (which includes the Group IV Drawback Claims) is similar to the first in many respects, but contends that, even if the underlying import entries were not liquidated before December 3, 2005, they nevertheless must have been liquidated (whether through the affirmative actions of Customs or by operation of law) no later than September 1, 2008.  Ford further contends that, pursuant to subparagraph (A) of the statute, the Drawback Claims would have been deemed liquidated within one year following the liquidation of the underlying import entries, such that – according to Ford – the Drawback Claims were deemed liquidated pursuant to

## IV.  <u>Conclusion</u>

For all the reasons set forth above, Plaintiff's Motion for Judgment on the Record must be

granted.

As applied to the 17 Drawback Claims at issue, Customs' interpretation of 19 U.S.C. §

1504(a)(2)(C) as providing for the deemed liquidation of drawback entries and claims described by

that subparagraph (*i.e.*, drawback entries and claims "filed before December 3, 2004, the liquidation

of which [was] not final as of December 3, 2004") only to the extent that such drawback entries and

claims had no underlying import entries (*i.e.*, consumption entries) that were not liquidated and final

as of December 3, 2005 is erroneous, arbitrary and capricious, and otherwise not in accordance with

law.  The 17 Drawback Claims at issue were deemed liquidated by operation of 19 U.S.C. §

1504(a)(2)(C) as of December 3, 2005, without regard to the liquidation status of the import entries

(*i.e.*, consumption entries) underlying those Drawback Claims.  And, finally, Customs has no legal

authority to review, liquidate, or take any other action with respect to the 17 subject Drawback

Claims (including the five that Customs purportedly affirmatively liquidated after this action was

commenced[27]), other than to recognize the status of those Drawback Claims as deemed liquidated

---

subparagraph (A) before this action was commenced on September 2, 2009.  *See* 19 U.S.C. §
1504(a)(2)(A).

    *See generally* Pl.'s Brief at 2, 6-7, 16-21, 25; Pl.'s Reply Brief at 1, 3, 8-12; Pl.'s Supp. Brief
at 2-5, 11-15; Pl.'s Supp. Response Brief at 2, 6-18; Tr. at 8-19, 35-36, 60-70, 73-75 (counsel for
Ford).  *But see* Defs.' Response Brief at 23-29; Defs.' Supp. Brief at 9-19; Defs.' Supp. Response
Brief at 7-11; Tr. at 45-52, 54-59, 70-73, 75-78 (counsel for the Government).

    [27]Ford asserts generally that there is no reason to treat the five Drawback Claims that
Customs purportedly liquidated after this action was commenced any differently than the other
twelve Drawback Claims at issue here.  *See generally* Pl.'s Brief at 26-28.  In the early stages of this

as of December 3, 2005, at the amounts claimed by Ford.

Judgment will enter accordingly.[28]

_____/s/ Delissa A. Ridgway_____
Delissa A. Ridgway
Judge

Decided:  January 13, 2015
              New York, New York

litigation, the Government argued that the Court lacked jurisdiction over those claims, and lost.  *See generally* Ford I, 35 CIT at ____, 806 F. Supp. 2d at 1337-38.  In the briefing on Ford's pending motion, however, the Government has not argued that the relief available to Ford vis-a-vis those five

Drawback Claims differs in any way from that available vis-a-vis the other 12 Drawback Claims. Indeed, the Government has expressed no view on the matter.

[28]The parties will be accorded the opportunity to address the need (if any) for further declaratory relief and for injunctive relief, before Judgment enters.